We're going to ask the lawyers who are going to argue to step up at this time, introduce themselves, and tell us whom you represent. Good morning, Your Honor. Michael Dimitrio, or William Dimitrio. I represent the plaintiff at the moment. Good morning, Your Honors. Anthony Rutkowski. I represent the defendant at police, Securitas Security Services USA, Inc. Thank you, Counsel. Under Supreme Court Rule 352B, each side has 20 minutes for the main argument, and the appellant has 10 additional minutes for rebuttal. We may change that if there are a lot of questions or if the argument becomes repetitive. Please remember to speak loudly. Our microphones do not amplify, but merely record what is being said. Also, please understand we have read the briefs and are very familiar with the facts of the case, so devote your time to your strongest arguments. Justice Cunningham is the third member of the panel. She is unable to be here today. However, she has read the briefs and will thoroughly participate in our deliberations as well as listen to the tape recording of the arguments. All right. Mr. Dimitrio? Thank you, Your Honor. Since I've introduced myself, I'll eliminate that to save time. May it please this Honorable Court, I'm before you today on behalf of the family of Ellen Felika to seek a reversal of a summary judgment entry below that we feel was erroneous in several respects. The issue before this Court is one of duty. The sole finding of Judge Gomelinsky below was that Securitas, the only defendant involved before this panel, a nationwide, worldwide security company, in this particular matter had no duty to provide security for Ellen Felika, who, as you're aware from reading all the material, was attacked at Sintagra Hospital by the federal government. Well, Mr. Dimitrio, is the issue not simply whether they had a duty to protect her, but whether or not they've reached whatever duty they had by not failing to stop this particular kind of an attack? I would respectfully suggest to Your Honor that in your de novo review you can look at that, but in the proceedings below, that we never got to that. Judge Gomelinsky ruled point blank that they had no duty whatsoever. In fact, what I truly believe brings us here today is Judge Gomelinsky improperly imposed a burden on the plaintiffs in this case, saying in his findings and ruling in the summary judgment, again, point blank, no duty, they stopped there. Because there's no duty, nothing else has to be addressed. He stated that he saw nowhere in the materials that were presented before him on this summary judgment motion that he didn't see anywhere that Securitas guaranteed the safety of anybody. That, I would submit to this Court, was a burden that would not exist in this case, does not exist under the law, and is totally unfair to the estate that stands before you today through me. In this particular case, it is a criminal attack by a third person. We go back to the landmark case that controls the situation, which Judge Gomelinsky said he reviewed. He did not share an analysis, really, of the case, but the Pippin v. CHA case. In that case, it was established that there could, in fact, be liability for a criminal attack by a third party on a security company if they had the responsibility to protect individuals. And from what source do we discern the scope of that responsibility? Is it the contract between Securitas and the Medical Center, or is it common law, or is it both? It's both, and it goes a little bit beyond the contract. There is a clear contract that went into effect 16 days before this tragic event, where Securitas undertook to provide security at this particular location. The place where I would direct the Court for the quick answer is, in this case, the defense hired an expert in the area of security, Mr. Murphy. Mr. Murphy first issued a report that was part of the pleadings of this motion, and then between the initial ruling and the motion of reconsideration, Mr. Murphy was- Let me take that back, Judge. Justice, I apologize. The day before the ruling, I deposed Mr. Murphy. From both sources, Mr. Murphy said the responsibility of Securitas was established by the contract and the post orders. And the post orders. Post orders. The contract incorporates them. The defense argued the post orders really are centegrous, so they're not our issue. I would submit that it truly is Securitas'. Well, is there anything in the record that demonstrates that the two security guards who were on duty that day violated the post orders in some way by doing what they were doing at the time of this attack and not being close enough to the receptionist to perhaps stop the attack? It's not so much not doing what they were doing, Your Honor. It was they did it negligently. In other words, where in the record will you find that on your de novo review? I would say your common sense, which the jury is charged to determine, and now we're getting to the issue of breach, which I would respectfully suggest even the Pippin court way back in 1979 said that's a jury issue. Before the Pippin Supreme Court was, you know, is there a legal duty under the circumstances here? The answer, yes. Then the court went on to say whether there was a breach of that duty in proximate cause or jury issues. And that's why I don't think Judge Kamalinsky ever got to that because he stopped it at duty. But the place that you can find the answer to your question that entitles us to a jury trial, and that's what we're seeking here, Your Honor, is a jury trial, is the testimony that's part of this record, the expert that we retained that's analyzed it, an expert who is, I would put before you his report, his TV, that's all part of this record, that opined that these two particular guards were negligent in the way they were carrying out their responsibilities, and that negligence was a proximate cause of this attack. But those two issues I would respectfully want to have a jury decide. And I went through both expert witness reports, all right, and I'm fishing around in my head for what your expert said exactly was negligent about, because they were both on the second floor, right, watching the video screens. One guy was making name tags. Correct. There was a security room that our expert and Mr. Murphy also viewed. It was equipped, it was two rooms and a doorway. There was direct contact between the two guards. The one was monitoring the monitors, viewing the monitors, which showed the path that the assailant would have taken, showed the assailant at the front entrance of the hospital when he went in, back, back in, and then, of course, the lobby itself. And what Mr. Potter, Anthony Potter, my expert said, in part, and, you know, to also point out to the Court, in this record before you are both all the reports of the experts, Mr. Potter on behalf of Plaintiff Appellant, Mr. Schmierich on behalf of the defendant, Mr. Murphy on behalf of the defendant, as well as the depositions of Mr. Potter and Mr. Murphy are all part of the record that sits before you at this point. In that record, and I believe Mr. Potter is testifying, I think it said C3515, Your Honor, and I'll verify that before I leave, he specifically stated that their lack of, A, not observing this individual prior to his entrance to the hospital, was a failure to perform their duties in a non-negligent manner. All right. Now, let's stop there for a second. Because one of our roles is, you know, we can't necessarily take experts, you know, without questioning the basis for their opinion, right? Correct. So if, you know, he's opining that the two security guards who were on the second floor, all right, were supposed to have seen someone walk through the front door on the camera, noticed that he had a can of gasoline and a cigarette lighter. Correct. All right. And then somehow get downstairs to the first floor quickly enough to stop him from attacking the receptionist who's located very close to the front door. How is that supposed to happen unless they're, like, have super speed or something? Two ways. Okay. I'll submit to you, Justice Bullard, one is it was brought out in the testimony that it would take less than a minute to go from this security room down. It's directly above, and there's a direct staircase. Two, the guards were equipped with both telephone and radios in which they could have immediately alerted Mrs. Polito to a potential danger. And that would have taken … But doesn't she have a better viewpoint of this guy than they do? One, we unfortunately can't know that because she never regained consciousness. But from the facts of the matter and the size of the area that we're talking about, she could have been distracted. She could have been talking to someone who was sitting in the lobby. A lot of things, you know, or you may be right that she may have had a better view. The bottom line on this area is I think that we're entitled to a jury to have that resolved because the case law is legion that those are jury issues. All right. Mr. Dimitrioff, I'd like you to, while we still have some time, address the factor that the cameras were not doing a direct live feed, but they were doing like flash snap still shots. So it was like every three seconds the scene would change. And how that might have affected the negligence issues here. Obviously, I don't want to say obviously, if the area is small enough, it could very well have been that all this happened too quickly for them to have done anything other than run downstairs to the fire extinguishers. That could be a factual finding. It's not like they're watching him in live time walking in with the gasoline. And this really, and if I'm correct, Justice Brewer, what you're getting to now is approximate cause. And here's the factual basis where I would say that the jury should resolve this. There were an independent witness whose deposition is before you in this record who testified that she was walking out of the facility. She saw this gentleman in the front area outside the building with his hand. And this is Kelly Lewis? Correct. Okay. And that he had a cigarette in his mouth. He went in. He came out, mumbled something about a cigarette, and then she continued walking and got to the parking lot, which is across the street, and then heard the screams from the fire. Was the cigarette used to accelerate the fire, or was it a lighter? It was a cigarette. Okay. Well. Or we don't know.  I don't want to say that definitively, Judge, because, again, you know, the attacker is not certainly reliable, and Mrs. Polifka can't help us out, and we didn't see it anyplace else. So, again, even though this wasn't really before Judge Malinsky, or certainly to the extent that you and I are discussing this, those are all issues that I think our case law in this court has found time and time again, breach of proximate cause, that this family would be entitled to have a jury result. What brings us here today. The question in my mind here is I think you're jumping over whether or not a duty of care exists, and you have a contract between parties. That contract says that the security firm does not and will not under the terms hereof or otherwise provide or furnish any service that directly or indirectly requires armed personnel or guard animals. And they weren't armed. They only wore uniforms. They weren't stationed in the main area. They were somewhere up on the second floor. The contract goes on to say that in no event will securities or its insurers be liable for any claim, loss, damage, or expense arising from a violent action. How do you jump over this? Easily, Your Honor. Tell me how you easily do that. Through the defense zone expert, because you start with the contract and you're reading from the amendment of the contract. And it also mentions terrorism, which was argued down below. If this was an act of terrorism, I would respectfully suggest that it wasn't. And even if it was, there would be a jury question whether he was a terrorist or not. But Mr. Murphy stated that the duty of securities emanates from the contract that you just read, part of the contract, as well as the post orders. And the post orders clearly state that they will deter criminal activity and protect the personnel of Syntagma. From there, I don't believe I'm taking a leap of faith that under the standard of summary judgment, the real standard that puts everything in our favor, that we were wrongfully denied the right to a jury trial. That's where our position is. Now, Justice Breyer, I haven't been keeping track of time, but I think we've hit upon why I believe we're entitled to be sent back below. And I will leave so Mr. Murkowski can make his argument and maybe have a couple points everybody. That's fine. Thank you. Thank you. You can proceed when you're ready. May it please the Court. What we have before the Court is a case that involves a tragic heinous crime. There's no question. But this case also is a case where there was no duty on the part of my client to prevent this crime from occurring. The facts in this case are straightforward and they're not in dispute. The most critical fact is what type of business my client is in. We are a private security staffing provider. In this case, we didn't undertake to formulate a security plan. All we did was undertake to staff a plan that was already devised by our client, Centegra Health Systems. The testimony is that William Riggs, who was the director of security for Centegra Health Systems, was the architect of the security plan for all three Centegra facilities. The particular facility where this occurred was on South Street. South Street is, by the testimony, in a residential neighborhood located next to houses in a high school. This is in Woodstock, Illinois, a town with a population less than 40,000 people. When we come in to provide security pursuant to the contract, we're doing so based upon Centegra's plan, not our own. Centegra did not contemplate in hiring us that we would formulate any idea about how many guards are required or where guards are posted. Centegra set out all of those details in advance. As the client, they decide how many security officers they want to pay for. They decide which security officers they want at which facilities and for what periods of time. At those particular facilities, Centegra sets the posts. As you've discussed earlier, the post that these two security officers were stationed at was not in the lobby. Centegra specifically did not want security officers in the lobby of this facility. They did so because they did not want to discourage any mental health patients from coming into what was the public area of this building, which is the reception area where this incident occurred. Is there anything in the record that shows the distance between the front door to the outside and the reception desk? The only thing that I could cite to are in the original record, I know in summary judgment we produced the video feed that came off of the main camera in the lobby. It overlooked Ms. Bluka's desk. Those screenshots are black and white and they're not very helpful. And I would submit, Your Honor, that those screenshots are all that a security officer would have seen amidst a bank of video monitors that monitored three separate facilities. Because it appeared from at least what I looked at the other day, the camera is overhead of the reception desk. It is. Rather than looking at the front door. Is that correct? Yes, that's true. Is there any other cameras that did different shots? There was an exterior mounted camera that did not pick up any presence of anyone. The first known presence of Lawrence Huxtad at the scene is depicted in the photographs that were provided. The security cameras are also an issue because Securitas had nothing to do with those cameras in terms of the setup or the alignment or the design of the system where cameras should be placed. Securitas came in and what they did is they provided staffing. If you look at the contract, Securitas was to have trained security officers pursuant to the state requirements. These officers met those requirements. The two officers who were working that day, there's no evidence that they did anything other than that which they were supposed to do. One officer was supposed to sit and monitor the bank of video monitors. The other officer then would absorb a variety of tasks and they would change off. One was making ID badges. Adam Lockinger at the time of the occurrence was making ID badges. Matthew Trementhick had just completed a patrol, the patrol of which is prescribed by Sintegra. They provided equipment that would cause them to hit certain places to demonstrate that a patrol had occurred, and Sintegra prescribed where those places were for the particular patrols, both on the inside and on the outside of the building. These two officers did everything that they were supposed to do that day on their shift. Now, Lawrence Huckstadt is a patient of the facility. The evidence isn't in dispute there as well. He was under active treatment. Dr. Rafik handled an outpatient treatment program there. This patient was part of the program. He had completed a form that said, you are not allowed to share any personal information with anyone. There was no indication when this individual left treatment at noon that he posed any threat to himself or others. And based upon the case law and the practice at Sintegra, there's no conversation that would have ever been had either with Securitas or anyone else regarding Mr. Huckstadt's departure. And Mr. Huckstadt left the facility before Ms. Bolivka came on shift to work that desk. So I know in the appellant's brief there's a mention of a prior dust-up, if you will, between Mr. Huckstadt and Ms. Bolivka. The only evidence of that is what's pled in the complaint. There's no evidence in the record whatsoever. And, in fact, their own experts said in reviewing the records that there's no evidence. So Ms. Bolivka never had any contact with Mr. Huckstadt. Mr. Tremendthick was totally unaware of Mr. Huckstadt. Mr. Lockinger had met Mr. Huckstadt on a previous occasion when he worked for the predecessor security company at another Sintegra facility. Met him. That's it. The facility that we're talking about, South Street, is the only place to get mental health support and services in McHenry County. The lobby is a public space. The testimony of William Riggs is that Ms. Bolivka served as the first barrier to entry because she was at the reception desk. The issue in this case, as I said, is about duty. And it seems to me that in order to look at duty, we need to look at the contract because under the restatement, that's where any duty could arise. The issue is about a contractual undertaking. When we look at the contract, it's clear on the face of the document that Securitas did not undertake to prevent or protect against violent criminal activity or any situation that was outside of their control. Well, let's take the word guarantee off the tape. Obviously they can't guarantee. I would agree with that, Your Honor. But, you know, what the heck are they there for if not to protect the staff against criminal activity or against some kind of tortious? Your Honor, I would submit that they are there to detect, deter, and report. As the Adaroos case indicated, involving Vance. The security company is there to assert a presence. They are not there, as we just said, to guarantee that things won't happen. We can't do that. What we can do is staff a security plan that was designed by Sintegra and undertake those things that Sintegra wanted us to undertake. In this case, there's no evidence about protection. It's interesting to me that the plaintiff's or the appellant's brief in this case questions the issue of access control. And they point to the mission statement that's part of the post order. And the mission statement actually says something about access control. But if you look at Mr. Rigg's testimony, they don't want security guards in the lobby. Security guards actually didn't undertake any responsibility with respect to access control for the main entrance to the facility. None whatsoever. I mean, the fact of the matter is Sintegra, by design, wanted that main entrance to be open to the public. And I suppose that's the problem associated with this discussion, is that when you look at a security company and say, well, what are they there for? The answer is to serve what the client requested them to do pursuant to the contract. And that's what they did. In this case, Securitas' responsibility is not to design a security plan and not to lock down the facility. It certainly could be done, but at what cost? It would mean that patients wouldn't get into the facility, the treatment would not be accessible, but the facility would be wholly locked down and safe from any conceivable thing that could occur. And remind me, were your guards armed or unarmed? Unarmed. Specifically unarmed by virtue of the contract. Sintegra wanted no arms whatsoever. They wanted unarmed security guards in what was termed a police-style uniform. The reason they wanted the police-style uniform, as Mr. Riggs testified to, is because there were occasions where within the various units in this four-story building, Sintegra's personnel would call for security. A security officer would respond to the unit, and they would do what was called a patient standby, where the Securitas officer would sit in a room with the patient, not talk to the patient, not touch the patient, not do anything along those lines, but just allow their mere presence to allow the patient time to calm down from whatever had occurred before the security officer arrived. But was one of your officers directed to be stationed in this area where the event occurred? No, Your Honor. Who was in the lobby? Was it in the lobby that this happened? This happened directly in the lobby. So talking now about the contract, post-orders, anything, is there any clear-cut duty established in writing, setting forth that one of your people had to be in the lobby that day at the time of the occurrence? No, none whatsoever. And the testimony of Bill Riggs and Mr. Chandler, who were the two people responsible for security for Sintegra, is that they specifically did not want security officers in the lobby of the building. So we had no responsibility whatsoever, and were actually discouraged from even standing in the lobby and standing talking to the receptionist in conversation because of the way that we were attired. They did not want patients to be discouraged from coming and seeking treatment, and were afraid that someone appearing to be security might discourage that from happening. That's specifically why they posted security on the second floor in that office space that had the monitors and the ID badge machine. That's where the security post was designated. It was not designated by Securitas. It was designated by Sintegra. Now, the nature of this occurrence is horrendous, but it's not something that I would submit that occurs every day or would be reasonably assumed to happen. I don't think that it would be reasonably foreseeable for someone in my client's position to foresee that someone would come in and literally throw gasoline under a receptionist from a paint can. And I think that's one other thing that's missing from the discussion, is that this Lawrence Huxtad did not approach the hospital with a sign that said, I'm going to set the hospital on fire. He approached the hospital apparently smoking a cigarette, which I don't think is notice of anything dastardly or untoward. He approached carrying a paint can, which similarly is not a signal to me or to a reasonable person that anything diabolical is about to occur. He entered the facility carrying a paint can. Ms. Wise, who is a witness to this, she was walking out of the hospital doorway as Mr. Huxtad was walking in. She wasn't unnerved by the paint can at all. What she thought was unusual is that somebody was smoking on hospital property. It's not a gasoline can. It's a small paint can, according to the still shots that we've been able to capture. Those still shots occur every three to four seconds, and you have all of them that came off the camera. You can see how quickly the situation developed. Mr. Huxtad literally walked into this lobby, threw the gasoline onto the receptionist's desk and the receptionist, and lit her and the reception area on fire. And the fire burned so bright and so quickly that it melted the camera off the wall. That's why we don't have any more snapshots. Even from that second floor, those officers responded as quickly as humanly possible, and they couldn't get there before the fire broke out, and they helped to put Ms. Kalivka out. So when you asked me earlier about the distance and the time, what happens after this occurrence in terms of response is illustrative of that. They were there immediately. They ran quickly, but there was nothing they could do, and there was no notice that they were provided by virtue of what was on the video. It was a man carrying a container, pure and simple. It happens every day. You know, we see it all the time. People are carrying a container, a cup, or what have you. But that's not indicative that something awful is about to happen. In this particular case, these officers did everything that they were supposed to do. When we're supposed to look at duty here, and then we look at voluntary undertaking, we have to look at what it is that they undertook to do. Mr. Riggs was very specific about that. He was the director of security for Centegra. He hired securitizers, and he said they're supposed to monitor the video monitors in the second floor. They're supposed to conduct the patrols that we set out. They're supposed to make ID badges. They're supposed to respond to the hospital wards when called. They're not supposed to be in the lobby. They're not supposed to assert a physical presence in the lobby to deter people from coming in. In this case, there's absolutely no evidence whatsoever that Ms. Polivka relied in any way on the presence of security at this site. There's no testimony, nothing in the record whatsoever. So the third prong of the restatement isn't met. The second is that if we've undertaken to perform a duty owed by another to a third person, there's no duty to prevent criminal attacks against third parties. It's evident in the contract that we did not undertake to prevent criminal attack. So the second prong of the restatement isn't met either. And the first prong is failure to exercise reasonable care increases the risk of such harm. What we did is what we were supposed to do, what we contracted to do. And when I look at the Castro case, it talks about how we have to look at the scope of the undertaking. When we look at what we undertook under the contract, and we look at the testimony of Mr. Riggs and Mr. Chandler as to what the security officers were supposed to do, we clearly did not commit an undertaking that creates a duty to stop this type of attack from occurring. The issue here is not the mere possibility that something could occur. It's got to be much more certain than that. We've got to look at the foreseeability of the injury, the likelihood of the injury occurring, the magnitude of the burden regarding against that injury, and the consequences of placing that burden on the defendant. In this case, I submit that the reasonable foreseeability of someone walking in and dousing the receptions with gasoline is remote at best. The likelihood of the injury occurring is, again, very remote. This is not something that occurs on a daily basis. The magnitude of the burden regarding against such an injury is tremendous. We have unarmed security officers who aren't posted in the lobby. They're posted away from the lobby. To say that these two security officers have a duty to act to prevent this type of attack imposes a tremendous burden on security, especially because we're a staffing company. As I said, we don't prescribe the security plan. What we do is staff the plan that's been provided to us. The consequences of placing that burden on the defendant are tremendous. There's nothing that Securitas or any of its officers could have done in this case. Now, there's been a lot of talk about the experts in this case, and I want to touch on that as well because an expert can't create a duty. The duty is derived based upon the extent and scope of the undertaking here, which is defined by contract. It's interesting to me that Mr. Potter renders all of his opinions, and yet he admits he never read the contract and he never read the post orders, and yet he says that there's a duty, and the appellant wants to use Mr. Potter's testimony as support for the position that a duty exists. No duty exists in this case. I think that this case is virtually identical to the Adderis v. Vance case. We have the same set of circumstances, a private security company providing staffing services to a plan devised by the client. In that case, there was nothing that the security officer could do when the person came in with a golf bag and brandished a weapon. It's the same situation here. I ask you to bring your argument to a close at this point. Thank you, Your Honor. In closing, I'm going to end where I started. This is a tragic, heinous criminal act. The question is whether it was objectively reasonable for Securitas, as a provider of private security staffing services, to reasonably expect that someone would enter the Centegra Health facility and intentionally set the receptionist on fire, such that Securitas would have a duty to take measures to guard against such an incident occurring. The answer is no. I'll end with the Washington v. City of Chicago case, where the only Supreme Court I think said it best. They said, were injury results from freakish, bizarre, or fantastic circumstances, no duty is present and no negligence claim can be asserted. If there was ever a case that had freakish circumstances, bizarre circumstances, it's this case. Thank you. Thank you. Mr. Dimitrio. Mr. Dimitrio, opposing counsel mentioned toward the end that your expert witness, Mr. Potter, admitted not to reading the contract of the post orders. Is that correct? I'm sorry. That he admitted that he didn't read the contract of the post orders. Is that correct? And is that not relevant? I have no memory of that, but I don't think it's relevant to resolve this case before this panel, because of a very simple reason, that even if he did, and I can't answer your question off the top of my head, I apologize, it is clear Mr. Murphy did. And Mr. Murphy, the defense expert testified and wrote in his report that Securitas' duties emanate from the contract and the post orders. Now, I have two things I'd like to say, wrapping up for the court. One, the majority of what you just heard from Securitas' attorneys compels us to go back to a jury trial, because the vast majority of it all dealt with the issues of breach and approximate cause, which are jury issues in this jurisdiction. Secondly, with respect to the duty issue, two things. I'm sure inadvertently, but this court's been misled. The last thing I want your honors to do is leave this bench and think, well, gee, Securitas signed up to put two guys in a little room, and for them to sit there and, you know, do whatever they do in the little room. That's not the fact at all. And if you look at the record, putting aside the duty issue thing, they have patrol duties, they have security door issues, they have all sorts of things. And in addition to that, this particular guard that was there, on a previous occasion was called for this very attack within the Setegra system because he was causing a problem. So all these issues that they're saying aren't issues, aren't clearly issues, but they're jury issues. Finally, well, two things. They sort of meld together. When the court goes back and looks at this record, you will get to see the post orders. You can see right here, 3715 and 3716. And I think this answers both your honors' questions. They are the post orders. It has Securitas' name on it, and it has Setegra's name on it. For this defendant to say we're sloughing this off on Setegra, we, the largest security company in the world, because we're just following their staffing, doesn't answer the question that's before this court. Even if that were true, they're still the security company, and they still assume the duty. And when you go to page 3716, it says specifically, help to serve as a deterrent to criminal attacks, violence, and theft and vandalism. So when you read the documents together, there is no question that they have not met their burden with respect to seeking summary judgment, given all, and which I'm certainly not going to repeat for this panel, all that's involved and all that this plaintiff's entitled to. And, you know, finally, the defense here today made the same mistake that Judge Gamolinsky made, because when you look at his comments, he relied also on what the defense says is the controlling case here, the Edras case. If you look at that, you will see in opposite terms from what I just read to what this court reviewed in that case, in which that security company, the Vance security company, put in specifically in their contract, and maybe this is where Judge Gamolinsky got it and misapplied it, that Vance does not ensure or guarantee the personal safety of any person or the security of property. Vance would not have any liability arising from the criminal act of any third party. That was in that contract in that case. It's not in the contract in this case, and as I just read to you, it's certainly not in the post orders, which the defense themselves exceed are part of their duties. Because of those factors, Your Honor, the plaintiff would respectfully request that the summary judgment entered below be reversed and this family be allowed a jury trial on these issues. Thank you. All right. Thank you, counsel. The panel will take the case under advisement. Court is in recess.